**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| FAIRCAST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, THE CINCINNATI INDEMNITY COMPANY, WAYNE PINNEY, DON ESKER, and DETROIT HOIST AND CRANE CO., L.L.C. a.k.a. DETROIT HOIST AND CRANE CO.,<br><br>Defendants. | Case No.   4:24-cv-00198<br><br>Removed from the Iowa District Court for Jefferson County, Case No. LALA004611<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION AND LOCAL RULE 81(a) STATEMENT** |

## NOTICE OF REMOVAL

Defendants, The Cincinnati Insurance Company, The Cincinnati Casualty Company, the Cincinnati Indemnity Company, Wayne Pinney, Don Esker, (collectively the "Cincinnati Defendants"), pursuant to 28 U.S.C. § 1446, hereby remove the above-captioned action, pending in the Iowa District Court for Jefferson County as Case No. LALA004611 to the United States District Court for the Southern District of Iowa. Subject matter jurisdiction is based upon 28 U.S.C. § 1332. As grounds for removal, Defendants state as follows:

## PROCEDURAL HISTORY

1.      On May 10, 2024, Plaintiff Faircast, Inc. ("Faircast") filed a complaint in the Iowa District Court for Jefferson County under Case No. LALA004611 (the "Petition").

2.      Pursuant to Local Rule 81(a), Defendant states it is unaware of any other matters currently pending in state court. The attorneys appearing in state court on behalf of the Plaintiff are Joseph A. Cacciatore and Gregory G.T. Ervanian,  Ervanian & Cacciatore, L.L.P., located at

317 Sixth Avenue, Suite 900, Des Moines, Iowa 50309. Their phone number is 515/244-9400. Their fax number is 515/282-4235. Their respective email addresses are Joe@eclawiowa.com and Greg@eclawiowa.com. No appearances have been filed on behalf of Defendant Detroit Hoist and Crane Co., L.L.C.

3.  Faircast is seeking compensatory and punitive relief concerning insurance coverage and alleged insurance bad faith for alleged property damage under a policy of insurance issued to it by The Cincinnati Insurance Company (the "Policy"). A true copy of the State Court Case Petition with all other filings served on Defendants are attached hereto as **Exhibit A**.

4.  The gist of the Petition is an insurance coverage dispute between Cincinnati Insurance Company and Faircast. Cincinnati Insurance Company had issued a machinery and equipment insurance policy to Faircast.

5.  Cincinnati Casualty Company and Cincinnati Indemnity Company are alleged in the Petition against them to be "material insurance companies." (Petition, ¶2). No other allegations address any alleged role or involvement of those entities in the case.

6.  Esker and Pinney are alleged to have been at all times acting within the scope of their respective employments with Cincinnati. (Petition, ¶¶ 3-4).

7.  On Sunday morning, May 19, 2024, Defendant Esker was personally served. The Iowa Department of Insurance accepted the Original Notice of Petition for Cincinnati Insurance Company, Cincinnati Indemnity Company and Cincinnati Casualty Company on May 16, 2024. The filed return of service on Pinney states that he was served by leaving suit papers with the Cincinnati Insurance Company legal department on May 17, 2024.

8.  Defendant Detroit Hoist and Crane Co. LLC has not appeared in this case.

9.  Thirty days have not expired since any one or more of the Cincinnati Defendants

were served with copies of the complaint setting forth the clam for relief upon which such action or proceeding is based. 28 U.S.C. §§ 1446(b).

10.     Faircast's Petition seeks replacement costs for certain property in approximate amount of $475,000.00.

11.     Faircast's Petition seeks a business interruption award in the approximate amount of $1,119,000.00.

12.     Cincinnati Insurance Company has paid Faircast a total of nearly $3.5 million for Faircast's claim.

## THE PARTIES

13.     A corporation is deemed to be a citizen of both the state of its incorporation and the place where it maintains its principal place of business. 28 U.S.C. §1332(c)(1).

14.     Faircast is an Iowa corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Fairfield, Jefferson County, Iowa. Accordingly, Faircast is a citizen of Iowa.

15.     The Cincinnati Insurance Company is an Ohio corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. Accordingly, it is a citizen of Ohio.

16.     The Cincinnati Casualty Company has nothing to do with this case and is not properly named as a party to this lawsuit. Nevertheless, it is an Ohio corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. Accordingly, it is a citizen of Ohio.

17.     The Cincinnati Indemnity Company has nothing to do with this case and is not properly named as a party to this lawsuit. Nevertheless, it is an Ohio corporation organized and

existing under the laws of the State of Ohio, with its principal place of business in Ohio. Accordingly, it is a citizen of Ohio.

18.     Wayne Pinney was at all times a resident and citizen of Ohio. Faircast admits that he was acting within the scope of his employment with Cincinnati and therefore he is not properly named as a party to this Petition.

19.     Don Esker was at all relevant times a resident and citizen of Iowa. However, Faircast admits that he was acting within the scope of his employment with Cincinnati . He was not in privity of contract with Faircast. In addition, Cincinnati Insurance Company is fully and without qualification indemnifying and holding both Esker and Pinney harmless regarding any and all liability involving or arising from the Petition.

20.     Accordingly, Esker is fraudulently joined to the Petition to evade diversity jurisdiction. Therefore, his citizenship should be ignored when considering removal. *See Block v. Toyota Motor Corporation*, 665 F.3d 944 (8th Cir. 2011); *Jimenez v. Marlin Firearms*, 2012 WL 12870225 (S.D. Iowa). *See also De Dios v. Indemnity Insurance Co. of North America*, 927 N.W.2d 611, 621-24 (2019).

21.     Pursuant to 28 U.S.C § 1332, District Courts have jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and, subject to the fraudulent joinder doctrine, that are  between citizens of different states.

22.     This matter is properly removed pursuant to 28 U.S.C. § 1441, which permits removal of cases to federal court based on diversity of citizenship.

## **AMOUNT IN CONTROVERSEY**

23.     28 U.S.C. § 1446(c) provides, in relevant part:

(2) If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be

4

deemed to be the amount in controversy…

24.     Here, Faircast seeks damages of over $1,590,000.00, an amount in excess of $75,000. This satisfies the jurisdictional amount prescribed in 28 U.S.C. § 1332(a).

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because, without fraudulent joinder, the dispute arises between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

26.     The U.S. District Court for the Southern District of Iowa encompasses the geographic region where the state court action is pending, Jefferson County, Iowa.

27.     Pursuant to 28 U.S.C. § 1446(d), promptly after filing this Notice of Removal, Defendants will give written notice to Faircast and will file a copy of this Notice of Removal with the Iowa District Court for Jefferson County.

28.     This Notice of Removal is signed in compliance with Fed. R. Civ. Proc. 11.

29.     In the event Plaintiff moves for remand, or this Court considers remand *sua sponte*, Defendants respectfully request the opportunity to submit supplemental authority, evidence and argument in support of removal, as may be appropriate.

**WHEREFORE**, Defendants hereby remove the above captioned case from the Iowa District Court for Jefferson County to the U.S. District Court for the Southern District of Iowa, Eastern Division, as provided by law, and will proceed with this action as if it had originally been commenced in this Court

Dated: June 13, 2024.

Respectfully submitted,

**LITCHFIELD CAVO LLP**

By:    <u>/s/ Daniel G. Litchfield</u>
       Daniel G. Litchfield
       (admission application forthcoming)
       **LITCHFIELD CAVO LLP**
       303 W. Madison Street, Suite 300
       Chicago, IL 60606
       Phone:     (312) 781-6699
       Fax:       (312) 781-6630
       E-Mail:    Litchfield@LitchfieldCavo.com

DICKINSON, BRADSHAW, FOWLER, & HAGEN, P.C.

By:
       Sean M. O'Brien    AT0005874
       Benjamin J. Kenkel   AT0014368
       801 Grand Avenue, Suite 3700
       Des Moines, IA  50309-8004
       Phone:     (515) 246-5891
       Fax:       (515) 246-5808
       E-Mail:    sobrien@dickinsonbradshaw.com
       E-Mail:    bkenkel@dickinsonbradshaw.com

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR JEFFERSON COUNTY

| | |
|---|---|
| FAIRCAST, INC., <br>     Plaintiff, <br><br> v. <br><br> THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, THE CINCINNATI INDEMNITY COMPANY, WAYNE PINNEY, DON ESKER, and DETROIT HOIST AND CRANE CO., L.L.C. a.k.a. DETROIT HOIST AND CRANE CO. <br>     Defendants. | Case No. <br><br><br> **PETITION AT LAW** <br><br> **AND** <br><br> **JURY DEMAND** |

COMES NOW the Plaintiff and states:

**PARTIES, JURISDICTION, AND VENUE**

1.      The Plaintiff, Faircast, Inc. ("Faircast"), is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Fairfield, Jefferson County, Iowa.

2.      Defendants The Cincinnati Insurance Company, The Cincinnati Casualty Company, and The Cincinnati Indemnity Company (collectively "Cincinnati") were at all times material insurance companies authorized to do business and doing business in Iowa.

3.      Defendant Wayne Pinney ("Pinney") at all times material was a resident of Ohio, and was acting within the scope of his employment with Cincinnati.

4.      Defendant Don Esker ("Esker") at all times material was a resident of Linn County, Iowa, and was acting within the scope of his employment with Cincinnati.

5.      Defendant Detroit Hoist and Crane Co., L.L.C. a.k.a. Detroit Hoist and Crane Co. ("Detroit") was at all times material a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Sterling Heights, Michigan.

1

EXHIBIT
A

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

Detroit's intentional tortious acts and/or omissions as alleged herein were related to or arose out of Detroit's contacts with Faircast, and caused foreseeable harm to Faircast.

6.      The contract at issue in this action was entered in Jefferson County, Iowa; the acts and/or omissions giving rise to this lawsuit occurred in Jefferson County, Iowa; and the Plaintiff's damages were sustained in Jefferson County, Iowa.

7.      Venue in the Iowa District Court for Jefferson County is proper pursuant to Iowa Code sections 616.7, 616.10, 616.18, and 617.3.

8.      The damages in this case exceed the maximum jurisdictional amount of small claims court.

**FACTUAL ALLEGATIONS**

9.      This lawsuit is necessitated by the wrongful denial and delay of insurance payments owed to Faircast by Cincinnati, and the tortious interference with Faircast's contractual relations and prospective business relations by Cincinnati and Detroit, resulting in the closure of Faircast and the loss of millions of dollars in past and future profits.

10.     Faircast was an iron casting foundry that commenced operations in Fairfield, Iowa in 2017.  Until the wrongful conduct of the Defendants as described herein, Faircast was a profitable company and a major employer in the Fairfield community.

11.     At all times material, Faircast owned and had in effect a policy of commercial property insurance with Cincinnati, policy number ENP 062 25 51, covering the period from July 10, 2021 to July 10, 2024 (the "Contract").  The Contract is attached hereto as Exhibit 1.   The Contract included coverage for Direct Damage (also referred to herein as "Property Damage"), with a limit of $30,000,000.00, and coverage for Business Income/Extra Expense (also referred to herein as "Business Interruption") with a limit of $5,250,000.00.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

12.     On May 26, 2022, Faircast sustained a loss that required Cincinnati to indemnify it under the Direct Damage and Business Income/Extra Expense coverages set forth in the Contract.

13.     Faircast's casting process utilizes a hoist system with a ladle that transports molten metal from holding tanks to molds.  On May 26, 2022, a shank hook in the hoist system fractured while a ladle of molten metal was being transported.  This caused the ladle to fall onto a platform, spilling the molten metal and causing damage.

14.     The hoist system was rendered inoperable due to the above-described accident.  The hoist system was essential to Faircast's manufacturing process, and Faircast could not efficiently fill orders until the hoist system was repaired or replaced, including individual component parts of the hoist system.

15.     Faircast timely reported the loss to Cincinnati on May 27, 2022.  Faircast timely submitted a proof of loss seeking recovery for damage to various components of the hoist system, including but not limited to, the shank hook, the hoist block, the holding tank deck, the hoist monorail, the ladle, the ladle motor, the ladle spreader bar, the control panel, and electrical service.

16.     The hoist block to which the shank hook was attached was manufactured by Detroit and was tailored to Faircast's unique hoist system.  The hoist block was damaged in the accident, and had to be replaced.  Faircast's hoist system could not properly operate unless and until the hoist block was replaced.

17.     Faircast also timely provided Cincinnati with a proof of loss seeking recovery for lost business income and extra expense occasioned by the accident of May 26, 2022.

18.     At all times material, Faircast's claims with Cincinnati under the Contract were handled, managed, and overseen by Pinney, who was a claims manager for Cincinnati, and by Esker, who was a claims specialist for Cincinnati.

3

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

19.     Cincinnati was Faircast's primary insurer in connection with the losses described herein.  At all times material, Faircast also had in effect a secondary commercial property insurance policy with London Market Insurers ("London").  Faircast timely placed London on notice of the losses described herein.   London's  handling  of  the  claim  was  dependent  upon  actions  taken, determinations made, and information provided by Cincinnati as the primary insurer.

20.     The  Contract  provides  the  following  with  regard  to  the  coverage  of  property damage at Section A. 1.:

**1.  Property Damage**

Subject  to  the  property  damage  limit  and  deductible  specified  in  the  policy declarations, and the property damage valuation provisions in Section E.1.k of this form, we will:

a.  Pay the expense you incur to repair or replace damaged "covered property"; and

b.  Also pay the reasonable extra cost to:

   1.  Make temporary repairs;

   2.  Expedite permanent repairs; and

   3.  Expedite permanent replacement.

21.     The Contract provides the following in relevant part for loss of business income and extra expense at Section A. 2.:

**2.  Business Income/Extra Expense**

Subject to the limit and the deductible specified in the declarations we will:

a.  Pay  the  "actual  loss  of  business  income"  you  sustain  from  a  total  or  partial interruption of business.

b.  Pay the reasonable "extra expense" you incur during the "period of restoration" to reduce or avert the "actual loss of business income".  We will pay for such "extra expense" to the extent that it does not exceed the amount of "actual loss of business income" that would otherwise be experienced.

    c.  Our liability under this coverage as described above, starts at the "commencement of liability", and ends following the "period of restoration".

22.      Under Section F. 4. of the Contract, "commencement of liability" is defined to mean at the time of the accident or 24 hours before Cincinnati receives notice of the accident, whichever is later.

23.      Under Section F. 18. of the Contract, "period of restoration" means the period of time beginning at the time of commencement of liability, and ending five consecutive days after the date when the damaged property is repaired or replaced.

24.      From the outset, Cincinnati, Pinney, and Esker unreasonably delayed making necessary determinations under the Contract, denied payments owed under the Contract without any reasonable basis, delayed making payments owed under the Contract without any reasonable basis, and failed to timely disclose relevant and material information to Faircast and London.

25.      Cincinnati retained an engineering firm, YA Engineering Services, to perform an analysis of the cause of the shank hook fracture in order to determine whether Cincinnati could or should make subrogation claims against Detroit and other third parties involved in the manufacture, maintenance, and inspection of Faircast's hoist system and its various component parts.  On or near August 1, 2022, Pinney received a report from YA Engineering Services dated July 31, 2022, which concluded that the cause of the shank hook fracture was inadequate inspection and maintenance.  According to Cincinnati's retained expert, the hoist block manufactured by Detroit did not fail and was not a cause of the accident of May 26, 2022.

26.      Notwithstanding the unequivocal conclusion reached by Cincinnati's retained engineering expert, Cincinnati placed Detroit on notice of a claim for subrogation as the manufacturer of the hoist block for losses sustained by Faircast in connection with the accident of May 26, 2022.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

27.     After Detroit was placed on notice of Cincinnati's subrogation claim, Detroit refused to do business with Faircast.  Detroit refused to manufacture a replacement hoist block for Faircast, or to supply any other hoist and crane parts to Faircast, unless and until Cincinnati agreed not to pursue a subrogation claim against Detroit.  Faircast attempted to locate another manufacturer to replace the hoist block, but any attempt to duplicate Detroit's hoist block required Detroit's cooperation, which Detroit intentionally withheld.  Any other potential remedy that would have permitted Faircast to resume normal operations was cost-prohibitive due to Cincinnati's wrongful delay and denial of Faircast's claims.

28.     Without a replacement hoist block, Faircast's hoist system was prevented from becoming fully operational, and Faircast lost sales, customers, and expected profits because it could not fill orders from existing, new, or prospective customers.

29.     Both Cincinnati and Detroit knew or should have known that the lack of a replacement hoist block would cause grave economic harm to Faircast, and would likely put Faircast out of business.  Both Cincinnati and Detroit also knew or should have known that Detroit's refusal to supply other parts for the hoist system would cause Faircast grave economic harm, and would likely put Faircast out of business.

30.     It was not until October 21, 2022, that Esker, on behalf of Cincinnati, sent a reservation of rights letter to Faircast.  The reservation of rights letter repeated the retained engineer's conclusion that the "root cause of the shank hook fracture was inadequate inspection and maintenance."  The reservation of rights letter made no reference to any fault or liability on the part of Detroit.

31.     Detroit communicated to Faircast that it would manufacture a replacement hoist block if Cincinnati would agree not to pursue a subrogation claim against Detroit.  Faircast

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

informed Cincinnati of Detroit's position.  Despite having no reasonable basis upon which to pursue a subrogation claim against Detroit, Cincinnati refused to timely inform Detroit that Cincinnati would not be pursuing a subrogation claim so that Faircast, its insured, could secure a replacement hoist block and resume normal business operations.  On information and belief, Cincinnati has never filed suit or otherwise subrogated against Detroit to recover for losses paid to Faircast.

32.     Despite being provided with a timely proof of loss, Cincinnati did not make its first business interruption payment to Faircast until December 29, 2022, and did not make its last business interruption payment until December 18, 2023.  Cincinnati's sole property damage payment was not made to Faircast until February 3, 2023.  The delay in making these payments caused financial harm to Faircast and ultimately contributed to its demise.  Cincinnati has never paid the full amounts owed for business interruption and property damage.

33.     Due to Cincinnati's inaction and delays, Faircast retained the services of EPIC Insurance Brokers and Consultants ("EPIC") and Quantus Claim Preparation Services ("Quantus") to assist Faircast in its effort to expedite the processing of claims with Cincinnati.  On November 21, 2023, Jason Diener of EPIC sent an email to Pinney stating in relevant part: "Faircast is hemorrhaging financially and they only have about nine days of cash before they run out.  They have asked us to exhaust all measures to secure any undisputed payments from insurers on open claims. . . .  Can you please review this claim and see if there is any undisputed amounts that you could advance this client as they are in desperate need."

34.     In an email message from Jason Diener to Esker dated January 12, 2023, Diener stated the following on behalf of Faircast: "You requested that we provide you with an itemized claim for the property damage expenses but we already sent that to you in the attached email on

11/16/22, nearly two months ago.  Has this information been reviewed?  Faircast is in desperate need for indemnification on this claim and we really need Cincinnati to step up and pay them for what they are owed. . . .   These delays in adjusting the claim are causing unnecessary financial hardship on Faircast."

35.    In an email message from Jason Diener to Pinney on January 12, 2023, Diener stated the following on behalf of Faircast: "Is there any way you can look into this for us?  We submitted this PD claim two months ago and we don't think anyone has looked at it.  The client is in desperate need of funds related to this claim.  They are laying off employees and we are trying to do our best to keep them afloat.  This should be an easy area to be able to review and identify costs."

36.    Due to the delays caused by Cincinnati, Pinney, and Esker, and due to Cincinnati's refusal to provide information to London, Faircast was also prevented from timely recovering payments under its coverages with London, further exacerbating Faircast's financial hardship and ultimately contributing to Faircast's demise.

37.    The Contract required Cincinnati to make a good faith determination regarding the duration of the "period of restoration" for purposes of making payments under the business interruption coverage.  Under the terms of the Contract, the period of restoration was to begin on the date of the accident and end five consecutive days after the date when the damaged property was repaired or replaced.

38.    Cincinnati, Pinney, and Esker decided that the period of restoration would commence on the date of the accident, May 26, 2022, and run through September 30, 2022, and that payments under the Business Income/Extra Expense coverage of the Contract would be paid to cover business interruption for that period of time.

8

E-FILED 2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

39.     Faircast's damaged property was not repaired or replaced by September 30, 2022, and Cincinnati, Pinney, and Esker knew or had reason to know that the damaged property had not been repaired or replaced by September 30, 2022.

40.     The decision to terminate the period of restoration effective September 30, 2022 resulted in Cincinnati making business interruption payments totaling $4,130,669.00 between December 29, 2022 and December 18, 2023.  This was more than $1 million less than the business interruption limit of $5,250,000.00.

41.     Even after Faircast informed Cincinnati of Detroit's refusal to manufacture a replacement hoist block, Cincinnati, Pinney, and Esker refused to extend the period of restoration to exhaust the business interruption limit, even though the hoist block could not be replaced due in part to Cincinnati's failure to timely inform Detroit that it would not be pursuing a subrogation claim against Detroit, and through no fault of Faircast.

42.     Cincinnati, Pinney, and Esker had no reasonable basis for ending the period of restoration on September 30, 2022, and said Defendants knew or had reason to know they had no such reasonable basis.

43.     Timely extending the period of restoration by approximately one month would have exhausted the business interruption limit under the Contract, and would likely have allowed Faircast to stay in business.

44.     Cincinnati, Pinney, and Esker failed to disclose to Faircast until April of 2023 that they had determined that the period of restoration would be terminated effective September 30, 2022, thereby preventing Faircast from taking additional measures to mitigate its losses.

45.     Cincinnati has failed to pay Faircast the full amount of property damage owed under the Contract as a result of the accident of May 26, 2022.  Cincinnati, Pinney, and Esker had no

reasonable basis for denying payment of property damage owed, and said Defendants knew or had reason to know they had no such reasonable basis.

46.     As of the date of filing this Petition, Cincinnati owes Faircast no less than $475,000.00 in property damage, and approximately $1,119,000.00 in business interruption indemnity, under the Contract.

47.     Because of the wrongful conduct of Cincinnati, Pinney, Esker, and Detroit, Faircast was forced to terminate its business operations in the first half of 2024, resulting in millions of dollars in lost profits.

### DIVISION I – CLAIMS AGAINST CINCINNATI, PINNEY, AND ESKER

### COUNT I – BREACH OF CONTRACT

48.     The Plaintiff hereby realleges paragraphs 1 through 47 as if fully set forth herein.

49.     Cincinnati entered into a Contract of insurance with Faircast.

50.     Faircast performed all of the terms and conditions required under the Contract.

51.     Cincinnati has breached the Contract with Faircast by failing to pay the full amounts due under the Business Income/Extra Expense and Property Damage coverages, and as otherwise set forth above.

52.     As a proximate cause of Cincinnati's breach of contract, Faircast has sustained damages that include, but may not be limited to:

    a.   The amount owed under the Property Damage coverage of the Contract.

    b.   The amount owed under the Business Income/Extra Expense coverage of the Contract.

    c.   Past and future lost profits.

E-FILED 2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

### COUNT II – INSURANCE BAD FAITH

53.     The Plaintiff hereby realleges paragraphs 1 through 52 as if fully set forth herein.

54.     Cincinnati, Pinney, and Esker had no reasonable basis for refusing to extend the restoration period and denying payment to Faircast of the full amount of the Business Income/Extra Expense limit of $5,250,000.00.

55.     Cincinnati, Pinney, and Esker knew or had reason to know that its denial or refusal to pay the full amount of the Business Income/Extra Expense limit under the Contract was without a reasonable basis.

56.     Cincinnati, Pinney, and Esker had no reasonable basis for denying the full amount owed under the Property Damage coverage of the Contract.

57.     Cincinnati, Pinney, and Esker knew or had reason to know that their denial or refusal to pay the full amount of Property Damage owed under the Contract was without a reasonable basis.

58.     Cincinnati, Pinney, and Esker unreasonably delayed the partial payments that were eventually made to Faircast under the Contract.

59.     Cincinnati, Pinney, and Esker knew or had reason to know that its delay in making the partial payments was without any reasonable basis.

60.     As a proximate cause of the bad faith conduct of Cincinnati, Pinney, and Esker, Faircast has sustained damages that include, but may not be limited to:

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

   a.   The amount owed under the Property Damage coverage of the Contract.

   b.   The amount owed under the Business Income/Extra Expense coverage of the Contract.

   c.   Past and future lost profits.

61.    The bad faith conduct of Cincinnati, Pinney, and Esker was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

### COUNT III – NEGLIGENCE

62.    The Plaintiff hereby realleges paragraphs 1 through 61 as if fully set forth herein.

63.    At all times material, Cincinnati, Pinney, and Esker had a duty to act with reasonable care and diligence consistent with the standards of the insurance industry.

64.    Cincinnati, Pinney, and Esker were negligent in one or more of the following particulars:

   a.   Failing to timely inform Detroit that Cincinnati would not be pursuing a subrogation claim against Detroit so that Faircast could secure a replacement hoist block and resume normal operations.

   b.   Failing to timely disclose to Faircast that they had determined that the period of restoration would be terminated effective September 30, 2022.

   c.   Failing to act with reasonable care and diligence under the circumstances.

65.     As a proximate cause of the acts and/or omissions of Cincinnati, Pinney, and Esker, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

66.     The conduct of Cincinnati, Pinney, and Esker was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

## COUNT IV – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

67.     The Plaintiff realleges paragraphs 1 through 66 as if fully set forth herein.

68.     Cincinnati entered into a Contract of insurance with Faircast.

69.     The law implies in every contract a covenant of good faith and fair dealing, including an implied condition that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.

70.     Cincinnati's conduct in failing to timely inform Detroit that it would not be pursuing a subrogation claim against Detroit so that Faircast could secure a replacement hoist block constituted a breach of the implied covenant of good faith and fair dealing.

71.     The conduct of Cincinnati, Pinney, and Esker in failing to disclose to Faircast until April of 2023 that they had determined the period of restoration would be terminated effective September 30, 2022, constituted a breach of the implied covenant of good faith and fair dealing.

72.     The conduct of Cincinnati, Pinney, and Esker as described in the Factual Allegations herein constituted a breach of the implied covenant of good faith and fair dealing.

73.     As a proximate cause of the aforementioned breaches, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

74.     The breaches by Cincinnati, Pinney, and Esker were willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

**COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

75.     The Plaintiff realleges paragraphs 1 through 74 as if fully set forth herein.

76.     Faircast had contractual relations with third parties to provide metal castings for uses that included but were not limited to farm equipment and machinery, railroad equipment, construction and industrial machinery, and elevator and escalator equipment.

77.     Cincinnati, Pinney, and Esker knew of Faircast's contractual relations with third parties.

78.     Cincinnati, Pinney, and Esker intentionally and improperly interfered with Faircast's contractual relations by failing to timely inform Detroit that Cincinnati would not be pursuing a subrogation claim against Detroit so that Faircast could secure a replacement hoist block.

79.     The improper interference by Cincinnati, Pinney, and Esker caused Faircast to lose contractual relations with its customers, and/or made Faircast's performance more burdensome or expensive.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

80.     As a proximate cause of the aforementioned conduct, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

81.     The conduct of Cincinnati, Pinney, and Esker was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

## COUNT VI – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

82.     The Plaintiff realleges paragraphs 1 through 81 as if fully set forth herein.

83.     Throughout its existence, Faircast regularly received new orders from both new and existing customers.

84.     At all times material, Faircast had prospective contractual or business relationships with its customers and prospective customers.

85.     Cincinnati, Pinney, and Esker knew of Faircast's prospective business relationships.

86.     Cincinnati, Pinney, and Esker intentionally and improperly interfered with Faircast's prospective business relationships by failing to timely inform Detroit that Cincinnati would not be pursuing a subrogation claim against Detroit so that Faircast could secure a replacement hoist block.

87.     The aforementioned improper interference caused Faircast's prospective business relationships to fail to materialize.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

88.      As a proximate cause of the aforementioned conduct, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

89.      The conduct of Cincinnati, Pinney, and Esker was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

## COUNT VII – FRAUD BY NONDISCLOSURE

90.      The Plaintiff realleges paragraphs 1 through 89 as if fully set forth herein.

91.      Cincinnati, Pinney, and Esker failed to disclose to Faircast until April of 2023 that they had determined that the period of restoration under the Business Income/Extra Expense coverage of the Contract would be terminated effective September 30, 2022.

92.      At all times material, Cincinnati, Pinney, and Esker knew that the disclosure of relevant facts as described above would correct mistakes as to basic assumptions on which Faircast relied in conducting its business operations after the accident of May 26, 2022.

93.      The failure of Cincinnati, Pinney, and Esker to disclose relevant facts constituted false representations on which Faircast reasonably relied.

94.      The nondisclosures of Cincinnati, Pinney, and Esker were material in that Faircast would have taken a different course of action had Faircast known the true facts.

95.      Cincinnati, Pinney, and Esker knowingly failed to disclose relevant facts to Faircast with the intent to deceive Faircast.

96.     As a proximate cause of the acts or omissions of Cincinnati, Pinney, and Esker, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

97.     The conduct of Cincinnati, Pinney, and Esker was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendants Cincinnati, Pinney, and Esker in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

## DIVISION II – CLAIMS AGAINST DETROIT

## COUNT VIII – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

98.     The Plaintiff realleges paragraphs 1 through 97 as if fully set forth herein.

99.     Faircast had contractual relations with third parties to provide metal castings for uses that included but were not limited to farm equipment and machinery, railroad equipment, construction and industrial machinery, and elevator and escalator equipment.

100.    Detroit knew of Faircast's contractual relations with third parties.

101.    Detroit knew that it had manufactured and supplied to Faircast a hoist block that was unique to Faircast's hoist system and manufacturing process, and that it would be difficult, if not impossible, for another manufacturer to duplicate the hoist block without Detroit's cooperation.  Detroit also knew that Faircast could not fill orders without a replacement hoist block.

102.    Detroit intentionally and improperly interfered with Faircast's contractual relations by intentionally and maliciously refusing to do business or cooperate with Faircast and its vendors,

17

by refusing to manufacture and supply a replacement hoist block, and by blocklisting Faircast within the hoist and crane manufacturing industry, in order to punish Faircast and put Faircast out of business due to Cincinnati's subrogation notice.

103.    The improper interference by Detroit caused Faircast to lose contractual relations with its customers, and/or made Faircast's performance more burdensome or expensive.

104.    As a proximate cause of the aforementioned conduct, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

105.    The conduct of Detroit was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendant Detroit in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

## COUNT IX – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

106.    The Plaintiff realleges paragraphs 1 through 105 as if fully set forth herein.

107.    Throughout its existence, Faircast regularly received new orders from both new and existing customers.

108.    At all times material, Faircast had prospective contractual or business relationships with customers and prospective customers.

109.    Detroit knew of Faircast's prospective business relationships.

110.    Detroit knew that it had manufactured and supplied to Faircast a hoist block that was unique to Faircast's hoist system and manufacturing process, and that it would be difficult, if not impossible, for another manufacturer to duplicate the hoist block without Detroit's

18

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

cooperation.  Detroit also knew that Faircast could not fill orders without a replacement hoist block.

111.    Detroit intentionally and improperly interfered with Faircast's prospective business relationships by intentionally and maliciously refusing to do business or cooperate with Faircast and its vendors, by refusing to manufacture and supply a replacement hoist block, and by blocklisting Faircast within the hoist and crane manufacturing industry, in order to punish Faircast and put Faircast out of business due to Cincinnati's subrogation notice.

112.    The aforementioned tortious interference caused Faircast's prospective business relationships to fail to materialize.

113.    As a proximate cause of the aforementioned conduct, Faircast has sustained past and future lost profits and other damages in an amount to be determined by the trier of fact.

114.    The conduct of Detroit was willful and wanton and done with malice or in reckless disregard of Faircast's rights, entitling Faircast to punitive damages.

WHEREFORE, Plaintiff Faircast, Inc. respectfully requests that the Court enter judgment against Defendant Detroit in an amount that will fully and fairly compensate it for its losses, punitive damages, interest as provided by law, court costs, and such other relief as the Court deems appropriate under the circumstances.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

## JURY DEMAND

The Plaintiff hereby requests a trial by jury of all factual issues herein.

/s/ Joseph A. Cacciatore
ERVANIAN & CACCIATORE, L.L.P.
Joseph A. Cacciatore, #AT0001390
joe@eclawiowa.com
Gregory G.T. Ervanian, #AT0002412
greg@eclawiowa.com
317 Sixth Avenue, Suite 900
Des Moines, Iowa  50309
Telephone:  (515) 244-9400
FAX:  (515) 282-4235
ATTORNEYS FOR PLAINTIFF

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT



The Cincinnati Insurance Company
The Cincinnati Casualty Company
The Cincinnati Indemnity Company

**Policy Number:** EMP 062 25 51

**Effective Date:** 07-10-2021

**Named Insured:** FAIRCAST INC

For professional advice and policy questions or changes, please contact your local independent agency:

EPIC INSURANCE MIDWEST
P.O. BOX 80159
INDIANAPOLIS, IN 46280-0159

812-478-6000

Dear Policyholder:

**Thank you**
Thank you for trusting The Cincinnati Insurance Companies with your commercial insurance coverage. We recognize that locally based independent agents have the working knowledge to help you choose the right insurance company for your needs. Together with your local independent insurance agency, we are committed to providing you with the highest level of service.

Please review your enclosed policy information to verify your coverage details, as well as deductibles and coverage amounts. Should your needs change, your agent is available to review and update your policy.

**Please promptly report claims**
If you experience a policy-related loss, you may report it by contacting your local professional independent agency representing The Cincinnati Insurance Companies or by directly calling us toll-free at 877-242-2544 and providing your policy number and claim-related information.

Sincerely,

Sean M. Givler
Senior Vice President - Commercial Lines

**EXHIBIT**

1

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# NOTICE TO POLICYHOLDERS
# DIRECT BILL ACCOUNT CREDIT PROCEDURE

This is a notice of how an account credit will be applied to your policy or to all of the policies being billed as single account.

**Account Credits**

A. If your account is comprised of a single policy and an endorsement or premium audit results in a credit (return premium), the credit is applied to that policy. If your account does not have a future installment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account. If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

B. If your account is comprised of more than one policy and an endorsement or premium audit results in a credit (return premium), the credit is applied in the following manner:

- Payments previously applied to your account are deferred.

- The credit that results from the endorsement or audit is applied to the policy generating the credit.

- The payments that were deferred are then reapplied to the account in order to satisfy the amount due.

- Any excess payment that results from the credit is applied proportionately to your policies with a future payment or installment due.

- If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

- If your account does not have a future installment or payment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account.

(Does not apply to audit return premium for payors located in New York; Does not apply to premiums due more than 30 days from the date of processing for payors located in New Hampshire. These credits are automatically refunded to the payor)

To request a refund, contact us at:

| Mailing Address | Toll free phone number | Electronic mail |
|---|---|---|
| The Cincinnati Insurance Company<br>PO Box 14529<br>Cincinnati, OH 45250-0529 | 877-942-2455 | CindiBill@cinfin.com |

IA 4407 03 13

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# SUMMARY OF PREMIUMS CHARGED

Attached to and forming part of
POLICY NUMBER:  ENP 062 25 51                    Effective Date: 07-10-2021

Named Insured:  FAIRCAST INC

## THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE
## PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

| Coverage | | Amount |
|---|---|---|
| Commercial Property Coverage Part | $ | |
| Commercial General Liability Coverage Part | $ | |
| Commercial Auto Coverage Part | $ | |
| Commercial Umbrella / Excess Liability Coverage Part | $ | |
| MACHINERY & EQUIPMENT — BUSINESS INCOME | $ | 18,164 |
| MACHINERY & EQUIPMENT — DIRECT DAMAGE | $ | 6,757 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| Terrorism Coverage | $ | 187 |
| Installment Charge | $ | |
| ANNUAL TOTAL | $ | 25,108 |

PAYMENTS

|  | First Installment | Remaining Installment(s) |
|---|---|---|
| MONTHLY | * | * |

*SEE BILLING STATEMENT MAILED SEPARATELY

Automobile Coverages, Employers Liability, Employment Practices Liability Coverage, Professional Liability Coverage, Terrorism Coverage and / or Wrongful Acts Coverage, if included in the policy, are subject to Annual Adjustment of rates and premium on each anniversary of the policy.

Commercial Umbrella and Excess Liability, if included in the policy, may be subject to Annual Adjustment of premium on each anniversary. Refer to the Commercial Umbrella or Excess Liability Coverage Part Declarations form to see if this is applicable.

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

IA 102 A 09 08

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## SCHEDULE OF LOCATIONS

LOC.   STREET ADDRESS    CITY   STATE    ZIP CODE

1      905 W DEPOT AVE
       FAIRFIELD, IA 52556-2563

IA 904 04 04

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# NOTICE OF PRIVACY PRACTICES

For additional information on our privacy policies, including state specific information, please visit
https://www.cinfin.com/privacy-policy.

# BOILER/PTS POLICY

POLICY NUMBER:        ENP 062 25 51
OPERATOR:                      TB3
EFFECTIVE DATE:       07/10/2021
DATE PROCESSED:     07/13/2021

TRANSACTION TYPE:
HEADQUARTERS STATE:       IA
AGENCY NUMBER:       13317
COUNTERSIGNING AGENCY NUMBER:
MEMORANDUM COPIES:      0
ENGINEER COPIES:
EXTRA COPIES:
PRINT DATE:
PRINT TIME:
ZONE:
EDL:

INSURED:  FAIRCAST INC

AGENCY:  EPIC Insurance Midwest - 13-317

        925 Wabash Ave Ste 200
        Terre Haute, IN  47807

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# Machinery & Equipment Policy



**MAILING ADDRESS:** P.O. Box 145496, Cincinnati, Ohio 45250-5496
**HOME OFFICE:** 6200 S. Gilmore Road, Fairfield, Ohio 45014-5141
*www.cinfin.com*

BE 484 11 12

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT



## The Cincinnati Insurance Company
### A Stock Insurance Company

Headquarters: 6200 S. Gilmore Road, Fairfield, OH 45014-5141
Mailing address: P.O. Box 145496, Cincinnati, OH 45250-5496
www.cinfin.com ▪ 513-870-2000

# COMMON POLICY DECLARATIONS

RENEWAL

| DECLARATIONS | POLICY NUMBER  ENP 062 25 51 |
|---|---|

NAMED INSURED FAIRCAST INC

**ADDRESS**        905 W DEPOT AVE
(Number & Street, FAIRFIELD, IA  52556-2563
Town, County,
State & Zip Code)

**Previous Policy Number:**
EBP 266 98 98

**Policy Period:**   At 12:01 A.M. STANDARD TIME AT YOUR

MAILING ADDRESS SHOWN ABOVE        FROM:  07/10/2021   TO:  07/10/2024

Agency     EPIC Insurance Midwest - 13-317

City        Terre Haute, IN

**Business Description**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

FORMS APPLICABLE TO ALL COVERAGE PARTS: (show numbers)
BE501     05/16

TB3
07/13/2021

Countersigned _____          By_____
                        (Date)                                (Authorized Representative)

ORIGINAL COPY

IA 503 01 12

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# Cincinnati Insurance Company

**Mailing Address: P.O. Box 145496, CINCINNATI, OHIO 45250-5496**
**Home Office: FAIRFIELD, OHIO 45014-5141**

A Stock Insurance Company

# MACHINERY AND EQUIPMENT
# COVERAGE FORM DECLARATIONS

**POLICY NUMBER:**  ENP 062 25 51       **Policy Period:** from  07/10/2021  to  07/10/2024  at 12:01 AM Standard Time at your mailing address shown in the Common Policy Declarations.

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.
FAIRCAST INC

905 W DEPOT AVE
FAIRFIELD, IA  52556-2563

---

**TOTAL ANNUAL PREMIUM: $** SEE IA102A          **Installment Payments** SEE IA102A
**First Installment: $** _____          **Remaining Installment(s): $** _____

---

**\*Limit of Insurance: $** _____

| | | | |
|---|---|---|---|
| Direct damage | Limit: $ 30,000,000. | Deductible: $ 50,000. |
| Business Income/ Extra Expense | Limit: $ 5,250,000. | Deductible: 5 X ADV |
| Consequential damage | Limit: $ | Deductible: |
| Consequential co-insurance % | | Deductible: |

## SCHEDULE

"COVERED LOCATION(S)" FOR "OBJECT(S)" SHOWN BELOW:
SEE IA904 FOR LOCATION LIST

"OBJECT" DEFINITION NO., SECTION NO. & DESCRIPTION                    COVERAGE

       5       COMPREHENSIVE COVERAGE

"CONTINGENT BUSINESS INCOME LOCATION(S)":

---

FORMS AND/OR ENDORSEMENTS APPLICABLE TO THE MACHINERY AND EQUIPMENT COVERAGE FORM:
See IA450F

SPECIAL PROVISIONS (if any):

---

**\*If a Limit of Insurance is specified, our payment for all loss from any "one accident" will not exceed the amount indicated.**
EPIC Insurance Midwest - 13-317
Terre Haute, IN  47807
07/13/2021 TB3

                    ORIGINAL COPY

BE 501 05 16

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### FORMS LIST

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| IA4338 | 05/11 | BE427 | 08/07 | BE432 | 12/99 | BE437 | 12/99 |
| BE451 | 12/99 | IA4387IA | 09/11 | IL0017 | 11/98 | IA4238 | 01/15 |
| IA4104IA | 09/16 | BE101 | 08/16 | BE446 | 08/16 | IA4236 | 06/20 |
| IP446 | 08/01 | IA904 | 04/04 | IA102A | 09/08 | | |

IA 450 11 87 F

# MACHINERY AND EQUIPMENT COVERAGE FORM

## TABLE OF CONTENTS

Begins on Page:

A. COVERAGE .................................................................................................................. 2
   1. Property Damage ................................................................................................. 2
   2. Business Income/Extra Expense ......................................................................... 2
   3. Consequential Damage (Spoilage) ..................................................................... 2
   4. Coverage Extensions .......................................................................................... 2

      a. Interruption of Service or Supply ................................................................. 2
      b. Automatic Coverage for a Newly Acquired Location ................................... 3

B. EXCLUSIONS ............................................................................................................. 3
   1. Earth Movement .................................................................................................. 3
   2. Nuclear Hazard ................................................................................................... 3
   3. War and Military Action ....................................................................................... 3
   4. Water ................................................................................................................... 3
   5. Explosion ............................................................................................................. 3
   6. Fire ...................................................................................................................... 3
   7. Miscellaneous ..................................................................................................... 4

C. LIMITS OF INSURANCE ............................................................................................ 4

D. DEDUCTIBLES ........................................................................................................... 4

E. MACHINERY AND EQUIPMENT CONDITIONS ........................................................ 5
   1. Loss Conditions .................................................................................................. 5

      a. Abandonment ............................................................................................... 5
      b. Appraisal ...................................................................................................... 5
      c. Duties in the Event of Loss or Damage ...................................................... 5
      d. Insurance Under Two or More Coverages ................................................... 6
      e. Legal Action Against Us .............................................................................. 6
      f. Defense ........................................................................................................ 6
      g. Loss Payable Clause ................................................................................... 6
      h. Other Insurance ........................................................................................... 6
      i. Privilege to Adjust with Owner .................................................................... 7
      j. Transfer of Rights of Recovery Against Others to Us .................................. 7
      k. Property Damage Valuation ......................................................................... 7
      l. Business Income/Extra Expense Valuation ................................................. 7
      m. Consequential Damage Valuation ............................................................... 8

   2. General Conditions ............................................................................................. 8

      a. Additional Insured ........................................................................................ 8
      b. Bankruptcy ................................................................................................... 8
      c. Liberalization ............................................................................................... 8
      d. No Benefit to Bailee ..................................................................................... 8
      e. Object Group ................................................................................................ 8
      f. Policy Period, Coverage Territory ................................................................ 9
      g. Concealment, Misrepresentation or Fraud ................................................. 9
      h. Suspension .................................................................................................. 9

F. DEFINITIONS ............................................................................................................. 9

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# MACHINERY AND EQUIPMENT COVERAGE FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F. DEFINITIONS** for meaning as used in this policy.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is, and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

## A. COVERAGE

We will pay for your loss caused by or resulting from an "accident" at a "covered location", under each of the coverages described in **A.1. – A.3.** below, for which a limit is specified in the policy declarations. If there is no "accident", or no limit specified in the declarations, there is no coverage.

### 1. Property Damage

Subject to the property damage limit and deductible specified in the policy declarations, and the property damage valuation provisions in Section **E.1.k.** of this form, we will:

a. Pay the expense you incur to repair or replace damaged "covered property"; and

b. Also pay the reasonable extra cost to:

(1) Make temporary repairs;

(2) Expedite permanent repairs; and

(3) Expedite permanent replacement.

### 2. Business Income/Extra Expense

Subject to the limit and the deductible specified in the declarations we will:

a. Pay the "actual loss of business income" you sustain from a total or partial interruption of business.

b. Pay the reasonable "extra expense" you incur during the "period of restoration" to reduce or avert the "actual loss of business income". We will pay for such "extra expense" to the extent that it does not exceed the amount of "actual loss of business income" that would otherwise be experienced.

c. Our liability under this coverage as described above, starts at the "commencement of liability", and ends following the "period of restoration".

We will not pay for any loss or expense due to:

d. The interruption of business that would not or could not have been carried on if the "accident" had not occurred.

e. Your failure to use due diligence and dispatch and all reasonable means to resume business at the "location(s)" shown in the schedule.

f. The suspension, lapse or cancellation of a contract following an "accident" extending beyond the time business could have resumed if the contract had not lapsed, been suspended or cancelled.

### 3. Consequential Damage (Spoilage)

Subject to the limit, deductible and coinsurance percentage specified in the declarations and "consequential damage" valuation Condition **E.1.m.**, we will:

a. Pay for "consequential damage" to "perishable goods" or other "specified property"; and

b. The reasonable expense incurred by you to reduce or avert "consequential damage" during the "period of restoration", to the extent that it does not exceed the amount of "consequential damage" that would otherwise be experienced.

### 4. Coverage Extensions

a. **Interruption of Service or Supply**

(1) We will pay for your loss and expense under Coverage **A.2.** and **A.3.** above, that are the result of a "service interruption" to a "covered location".

(2) We will also pay for your loss under Coverage **A.2.** above, that is the result of an "interruption of supply" from a "contingent business income location" identified in the declarations.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

b. **Automatic Coverage for a Newly Acquired Location**

We will automatically cover an "accident" to an "object" at a newly acquired location. This automatic coverage begins at the time you acquire the property and continues for 90 days, under the following conditions:

(1) You must inform us, in writing, of the newly acquired location within 90 days of the date you acquire it;

(2) The "object" must be in use or connected ready for use at the time of acquisition and throughout the period of automatic coverage and be of a type that would be included in any "object" group description shown in the Declarations;

(3) The Limit of Insurance and Deductible amount will be the highest amounts shown in the Declarations for the same type of "object";

(4) We will not be liable under this coverage for "consequential damage", "business income loss" or any other indirect loss resulting from an "accident" to an "object"; and

(5) You agree to pay an additional premium as determined by us.

## B. EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following:

Such loss or damage is excluded whether or not the loss or damage was caused by or resulted from an "accident".

1. **Earth Movement**

Any earth movement, including but not limited to earthquake, landslide, mudslide, subsidence, volcanic eruption or sinkhole collapse.

2. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

3. **War and Military Action**

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

4. **Water**

a. "Flood", surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.

b. Water that backs up or overflows from a sewer, drain or sump.

However, if covered electrical equipment requires "drying out" as a result of the above, we will pay for the amount you actually expend to dry out such equipment, subject to the applicable Property Damage limit and deductible.

5. **Explosion**

a. Explosion of any nature, other than explosion of the following "objects", caused by boiling liquid, expanding vapor, centrifugal force or mechanical breakdown:

(1) Steam boilers;

(2) Electric steam generators;

(3) Steam piping;

(4) Steam turbines;

(5) Steam engines;

(6) Gas turbines; or

(7) Moving or rotating machinery.

b. Explosion of gas or unconsumed fuel within the combustion chamber of any boiler, fired vessel or gas turbine, or within the passages from that combustion chamber to the atmosphere.

c. An "accident" that is the result of an explosion excluded above.

6. **Fire**

a. Fire or smoke, including fire or smoke that occurs at the same time, as an "accident" or that ensues from an "accident".

b. An "accident" that is the result of fire, smoke or water, or other means used to extinguish a fire, even when the attempt is unsuccessful.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**7. Miscellaneous**

An "accident" that is caused by any of the following causes of loss:

**a.** Aircraft or vehicles;

**b.** Lightning;

**c.** Sprinkler leakage;

**d.** Windstorm or hail;

**e.** Freezing caused by cold weather; or

**f.** Weight of snow, ice or sleet.

**C. LIMITS OF INSURANCE**

**1.** Our total payment for all loss arising from any "one accident" will not exceed the lesser of:

**a.** The sum of the limits specified in the declarations for coverages described in **A.1.** through **A.3.** above; or

**b.** Limit of Insurance when indicated in the declarations.

**2.** The limits for each of the coverages indicated in **A.1.** through **A.3.** above are separate, and in the event of an "accident" the unused portion of any coverage limit may not be used to increase the limit of another coverage.

**3.** The following additional limitations for direct damage to "covered property", or expense incurred as a direct result of an "accident", are part of and not in addition to the Direct Damage Limit indicated in the Declarations.

**a. Hazardous Substance Limitation**

If "covered property" is damaged, contaminated or polluted by a "hazardous substance" other than ammonia, the most we will pay for any additional expenses incurred by you for cleanup, repair or replacement, or disposal of that property is $100,000. As used here, additional expenses mean expenses incurred beyond those for which we would be liable if no "hazardous substance" had been involved.

**b. Water Damage Limitation**

If "covered property" is damaged by water as a direct result of an "accident", or covered "objects" require "drying out" as indicated in policy exclusion **B.4.**, the most we will pay for this kind of damage or expense, including salvage, is $100,000.

**c. Data, Media and Software Restoration Limitation**

If electronic data, electronic media or electronic software is lost or corrupted as the direct result of an "accident", the most we will pay for expenses incurred by you for the restoration of that data, media or software is $100,000.

**d. Ammonia Contamination Limitation**

If "covered property" is contaminated by ammonia as a direct result of an "accident", the most we will pay for this kind of damage, including salvage expense, is $100,000.

**e. Ordinance of Law Limitation**

If following an "accident" an increase in the loss occurs as a result of the enforcement of any ordinance, law, regulation, rule or ruling regulating or restricting repair, replacement, alteration, use, operation, construction or installation of damaged property, the most we will pay for the increased cost will be $100,000.

**f. Mold, Fungus and Mildew Limitation**

If as a direct result of an "accident", "covered property" other than "perishable goods" is contaminated by mold, fungus, mildew, yeast or any spores or toxins created, produced by or emanating from such mold, fungus, mildew or yeast, the most we will pay for any additional expense necessary to mitigate this contamination is $100,000.

Any payment made under Section **C. LIMITS OF INSURANCE** will not increase if more than one insured is shown in the Declarations.

**D. DEDUCTIBLES**

**1. Deductibles for Each Coverage**

**a.** Unless the Declarations indicate that your deductible is combined for all coverages, multiple deductibles may apply to any one "accident".

**b.** We will not pay for loss, damage or expense under any coverage until the amount of the covered loss or damage exceeds the deductible amount indicated for that coverage in the Declarations. We will then pay the amount of loss, damage or expense in excess of the applicable deductible

amount, subject to the applicable limit indicated in the Declarations.

c. If a time deductible is shown in the declarations for Combined Business Income/Extra Expense coverage, we will not be liable for any loss or expense under this coverage occurring during that specified time period immediately following the "commencement of liability".

d. If a multiple of daily value is shown in the declarations for Combined Business Income/Extra Expense coverage, we will first subtract from the total amount we would otherwise pay, a dollar amount that is equal to the daily value during the period of interruption at the "location(s)" where the "loss" occurred, multiplied by the multiple specified. The daily value is the amount that would have been earned each working day had no "accident" occurred.

e. If deductibles vary by type of "object" and more than one type of "object" is involved in any "one accident", only the highest deductible for each coverage will apply.

## E. MACHINERY AND EQUIPMENT CONDITIONS

The following conditions apply in addition to the Common Policy Conditions.

### 1. Loss Conditions

#### a. Abandonment

There can be no abandonment of any property to us.

#### b. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

Each party will:

(1) Pay its chosen appraiser; and

(2) Bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we will still retain our right to deny the claim.

#### c. Duties in the Event of Loss or Damage

You must see that the following are done in the event of loss or damage:

(1) You must immediately give notice of an "accident" to any of our offices. You must confirm that notice in writing. Our liability under this policy starts:

    (a) At the time of the "accident"; or

    (b) 24 hours before we receive notice of the "accident", whichever is later.

(2) As soon as possible, and at your own expense, provide us with evidence that the loss, damage or expense is the result of an "accident" as defined in this policy.

(3) Allow us a reasonable time and opportunity to examine the property and premises before physical evidence of the "accident" is removed. But you must take whatever measures are necessary to prevent further direct or indirect loss or damage.

(4) Permit us to inspect the property and records proving the loss or damage. Also permit us to take samples of damaged property for inspection, testing and analysis.

(5) If requested, permit us to question you under oath, at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

(6) Send us a signed, sworn statement of loss containing documentation calculating the dollar amount of the loss, damage and expense that you claim is covered, and any other information we request to settle the claim. You must do this within 60 days after our request.

(7) Resume business, partially or completely, and make up lost

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

business within a reasonable period of time by making use of every available means including:

**(a)** Working extra time or overtime, either at the "location" or at another location you acquire to carry on the same operations;

**(b)** The property or services of other concerns; and

**(c)** Merchandise or other property, such as surplus machinery, duplicate parts, equipment, supplies and surplus or reserve stock you own, control or can obtain.

This reasonable period does not necessarily end when operations are resumed.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** Allow us to examine any insured under oath, while not in the presence of any other Insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**d. Insurance Under Two or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage, subject to the Limit of Insurance.

**e. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form unless:

**(1)** There has been full compliance with all the terms of this Coverage Form; and

**(2)** The action is brought within 2 years after the date of the "accident"; or

**(3)** We agree in writing that you have an obligation to pay for damage to Covered Property of others or until the amount of that obligation has been determined by final judgment or arbitration

award. No one has the right under this policy to bring us into an action to determine your liability.

**f. Defense**

We have the right, but are not obligated, to defend you against suits arising from claims of owners of property in your care, custody or control. When we do this, it will be at our expense.

**g. Loss Payable Clause**

**(1)** We will pay you and the loss payee shown in the Declarations for loss due to an "accident", as interests may appear. The insurance covers the interest of the loss payee unless the loss results from conversion, secretion or embezzlement on your part.

**(2)** We may cancel the policy as allowed by the Cancellation Condition of the Common Policy Conditions. Cancellation ends this agreement as to the loss payee's interest. If we cancel we will mail you and the loss payee the same advance notice.

**(3)** If we make any payment to the loss payee, we will obtain their rights against any other party.

**h. Other Insurance**

**(1)** You may have other Insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

**(2)** If there is other insurance covering the same loss or damage, other than that described in **(1)** above, we will pay only the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.

In no case will we pay more than the applicable Limit or Limit of Insurance.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**i.   Privilege to Adjust with Owner**

In the event of loss or damage involving property of others in your care, custody or control, we have the right to settle the loss or damage with the owner of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

**j.   Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

**k.   Property Damage Valuation**

(1) We will pay you the amount you spend to repair or replace "covered property" directly damaged by the "accident". Our payment will be the smallest of:

   (a) The cost at the time of the "accident" to repair the damaged property with property of like kind, capacity, size and quality;

   (b) The cost at the time of the "accident" to replace the damaged property on the same site with other property:

      1) Of like kind, capacity, size and quality; and

      2) Used for the same purpose; or

   (c) The amount you actually spend that is necessary to repair or replace the damaged property.

(2) If you elect to repair or replace any damaged "object(s)" in a manner that:

   (a) Improves the environment;

   (b) Increases efficiency;

   (c) Enhances safety; or

   (d) Is necessary to maintain "green certification" that existed prior to an "accident" while maintaining the existing function, then we will pay up to an additional 50% above the repair or replacement expense, which would have been otherwise recoverable from Section **j.** **Valuation  1)a)** and **b)** above. This provision does not apply to any "object" that we have identified as being subject to ACV valuation.

(3) We will pay you no more than "actual cash value", if:

   (a) As a result of an "accident", an "object" must be replaced solely due to:

      1) Unavailability of a compatible replacement part or parts, due to age or obsolescence;

      2) Available replacement parts being incompatible with existing software or programming; or

      3) Loss or corruption of data or software, necessary to the operation of the "object", that cannot be recovered, restored or reinstalled.

   (b) The physical damage is to property that was obsolete or useless to you prior to the "accident".

(4) If you do not repair or replace the damaged property within 24 months after the date of the "accident", then we will pay only the smaller of:

   (a) Cost it would have taken to repair; or

   (b) "Actual cash value" at the time of the "accident".

Paragraph (4) does not apply to any time period beyond the 24 months that we agree to in writing.

**l.   Business Income/Extra Expense Valuation**

(1) Loss or expense under this coverage from an "accident" that occurs during the time this coverage is in force may continue beyond the termination or expiration of this policy. Our liability for that loss or expense is not lim-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ited by the termination or expiration;

  (2) The amount of our "extra expense" payment will reflect a deduction for the salvage value of any substitute or temporary equipment remaining after you resume "normal" operations.

**m.  Consequential Damage Valuation**

  (1) We will pay for "perishable goods" damaged or spoiled as a result of an "accident" on the basis of:

    (a) For raw materials, the replacement cost;

    (b) For goods in process or finished goods, the replacement cost of the raw materials and the labor and overhead charges attributable to those goods at the time of loss.

  (2) We will not pay the full amount of your loss if the "consequential damage" coverage limit specified in the declarations at the time of the "accident", is less than the product of the coinsurance percentage shown in the declarations times the value of all "specified property" at the "location" where the "accident" occurs. Instead, we will determine the most we will pay by using the following steps:

    (a) Divide the Limit of Loss by the product of the Coinsurance percentage multiplied by the total value of all "specified property" at the time of the "accident".

    (b) Multiply the total amount of the covered loss by the figure determined in Paragraph **(2)(a)** above.

    (c) Subtract the applicable deductible from the amount determined in Paragraph **(2)(b)** above.

    (d) The resulting amount or the Limit of Loss for "consequential damage", whichever is less is the most we will pay. We will not pay for the remainder of the loss.

  (3) As soon as possible after an "accident" you must make use of

every available means to reduce or avert loss partially or completely, including:

    (a) Use of merchandise or other property such as surplus machinery, duplicate parts, equipment, supplies and surplus or reserve stock you own, control or can obtain; and

    (b) Salvaging "specified property".

**2.  General Conditions**

**a.  Additional Insured**

If a person or organization is designated in this Coverage Form as an additional insured, we will consider them to be an insured under this Coverage Form to the extent of their interest. Our payment will not increase if more than one insured is shown on the Declarations.

**b.  Bankruptcy**

The bankruptcy or insolvency of you or your estate will not relieve us of an obligation under this Coverage Form.

**c.  Liberalization**

If, within 60 days prior to the beginning of this Coverage Form or during the policy period, we make any changes to any forms or endorsements of this Coverage Form for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Form, the change will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**d.  No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

**e.  Object Group**

All "objects" in use or connected ready for use and included in an "object" Group Definition will be considered as individually described in the Declarations. The premiums for "objects" included in an "object" Group Description will be adjusted as follows:

**(1)** We will base the initial premium for these "objects" on information we obtain. The rates charged will be those in effect on the first day of coverage.

**(2)** We will charge an additional premium for "objects" that are added to the policy after the effective date of this policy. The additional premium for these "objects" will be computed pro rata.

**(3)** We will allow a return premium for "objects" that are removed from the policy after the effective date of the policy. The return premium will be computed pro rata from the time the "objects" are disconnected.

**f. Policy Period, Coverage Territory**

Under this Coverage Form:

**(1)** The "accident" must occur:

**(a)** During the Policy Period shown in the Declarations; and

**(b)** Within the coverage territory.

**(2)** The coverage territory is:

**(a)** The United States of America; and

**(b)** Puerto Rico.

**g. Concealment, Misrepresentation or Fraud**

This Coverage Form is void in any case of fraud by you relating to it. It is also void if you intentionally conceal or misrepresent a material fact concerning:

**(1)** This Coverage Form;

**(2)** The Covered Property; or

**(3)** Your interest in the Covered Property.

**h. Suspension**

Whenever an "object" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "object". This can be done by delivering or mailing a written notice of suspension to:

**(1)** Your last known address; or

**(2)** The address where the "object" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "object".

If we suspend your insurance, you will get a pro rata refund of premium for that "object", but the suspension will be effective even if we have not yet made or offered a refund.

**F.  DEFINITIONS**

**1.**  **"Accident"** means a sudden and accidental breakdown of the "object" or a part of the "object". At the time the breakdown occurs, it must manifest itself by physical damage to the "object" that necessitates repair or replacement.

When the "object" or part of the "object" experiencing a problem is "electronic circuitry", that suddenly loses its ability to function as designed or intended with no apparent physical damage, we will concede physical damage has occurred if the "object" or part of the "object" can be restored to normal operation by replacing one or more "electronic circuitry" components.

None of the following is an "accident":

**a.**  Depletion, deterioration, corrosion or erosion;

**b.**  Wear and tear;

**c.**  Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

**d.**  Breakdown of any structure or foundation supporting the "object" or any of its parts;

**e.**  The functioning of any safety or protective device; or

**f.**  Any condition that can be reasonably remedied by normal maintenance such as:

**(1)** Replacing expendable parts.

**(2)** Recharging batteries.

**(3)** Rebooting, reloading or updating software or firmware.

**g.**  Any condition caused by or related to:

**(1)** Incompatibility of the "object" or part of the "object" with any software or equipment installed, introduced or networked within the prior 30 days; or

(2) Programming error, programming limitation, computer virus, malicious code, loss of data, loss of access, or other condition within or involving data or media of any kind.

2. **"Actual Cash Value"** means the market value of new, identical or nearly identical property less reasonable deduction for depreciation, age, condition and obsolescence. We will use a 3% depreciation factor for each year of use for the "object" not to exceed 50% depreciation.

3. **"Actual Loss of Business Income"** means the sum of:

   a. The net income (Net Profit or Loss before income taxes) that would have been earned or incurred following an "accident"; and

   b. Whatever part of the following charges and expenses the business failed to earn but would have earned if there had been no "accident":

      (1) Salaries and wages of officers, executives, employees under contract and other essential employees, as well as pensions and directors' fees.

      (2) Manufacturing, selling, administrative expenses and any other items contributing to your overhead expenses, including any ordinary payroll paid during the "period of restoration".

   In calculating the "actual loss of business income", we will take into account the actual experience of your business before the "accident" and the probable experience you would have had without the "accident".

4. **"Commencement of Liability"** means that our liability under this policy starts:

   a. At the time of the "accident"; or

   b. 24 hours before we receive notice of the "accident"; whichever is later.

5. **"Consequential Damage"** means loss due to spoilage from lack of power, light, heat, steam or refrigeration, resulting from an "accident".

6. **"Contingent Business Income Location"** means a location that:

   a. Is listed as a "contingent business income location" in declarations;

   b. Is operated by others within one mile of a "covered location"; and

   c. Supplies you with, or receives from you, raw materials, intermediate products, finished products, packaging materials or other product processing services essential to the continued operation of your "covered location".

7. **"Covered Location"** means the premises at the address(es) shown as "covered location(s)" in the declarations.

8. **"Covered Property"** means property that you own or property that is in your care, custody or control and for which you are legally liable. Such property must be at a "covered location" indicated in the declarations.

9. **"Drying Out"** means the restoration of electrical equipment to service following a "flood" by removal of excess moisture from that equipment including:

   a. Rinsing de-energized electrical equipment with clean fresh water, if necessary to flush away "flood" debris;

   b. Application of heat or controlled electrical current, circulation of air or use of dehumidification equipment;

   c. "Drying out" does not include or apply to:

      (1) Replacement or repair of any electrical equipment or parts thereof; or

      (2) Any expense related to deconstruction, demolition or reconstruction of any building component, structure or part thereof to gain access to electrical equipment.

   "Drying out" can be done in place, or equipment can be disconnected and moved if necessary to facilitate "drying out".

10. **"Electronic Circuitry"** means microelectronic components, including but not limited to circuit boards, integrated circuits, computer chips and disk drives.

11. **"Extra Expense"** means the additional cost you incur to operate your business during the "period of restoration" over and above the cost that you normally would have incurred to operate the business during the same period had no "accident" occurred.

12. **"Flood"** means a general and temporary condition of partial or complete inundation of normally dry land areas due to:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

a. The overflow of inland or tidal waters;

b. The unusual or rapid accumulation or runoff of surface waters from any source; or

c. Mudslides or mudflows, which are caused by flooding as defined above.

All flooding in a continuous or protracted event will constitute a single "flood".

13. **"Green Certification"** means certification by any nationally or internationally recognized environmental standards program that is designed to achieve energy savings and related objectives of the type included in the programs listed below:

a. The United States Environmental Protection Agency ENERGY STAR® program;

b. The U.S. Green Building Council LEED® program; or

c. The Green Building Initiative GREEN GLOBES® program.

14. **"Hazardous Substance"** means a substance declared to be hazardous to health by a governmental agency.

15. **"Interruption of Supply"** means failure or disruption of the normal flow of a raw material, finished product or product processing services upon which you rely, to or from any "contingent business income location" specified in the declarations, when such failure or disruption is caused by an "accident" to "objects" of a type covered under this policy at the "contingent business income location".

16. **"Object(s)"** means the equipment shown in the Declarations. Full descriptions of specific "object" categories are found in the Object Definitions endorsement attached to this Coverage Form.

17. **"One Accident"** means if an initial "accident" causes other "accidents" all will be considered "one accident". All "accidents"

at any one location that manifest themselves at the same time and are the result of the initial "accident" will be considered "one accident".

18. **"Period of Restoration"** means the period of time that:

a. Begins at the time of the "commencement of liability"; and

b. Ends 5 consecutive days after the date when the damaged property at the "covered location" is repaired or replaced.

19. **"Perishable Goods"** means your property subject to damage due to spoilage from lack of power, light, heat, steam or refrigeration, resulting from an "accident".

20. **"Service Interruption"** means loss of electricity, gas, water, steam, heat, refrigeration, air conditioning or communication services supplied by an entity you have contracted with to supply you such service, when that loss is caused by an "accident" as defined in this policy to "objects" of a type covered by this policy that are:

a. Owned or operated by the entity supplying you with such service; and

b. Located on or within one mile of a "covered location".

21. **"Specified Property"** means only the property described in the Consequential Damage portion of the declarations page.

22. **"Suit"** means a civil proceeding and includes:

a. An arbitration proceeding in which damages are claimed and to which you must submit or do submit with our consent; or

b. Any other alternative dispute resolution proceeding in which damages are claimed and to which you submit with our consent.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BRANDED OR LABELED MERCHANDISE

This endorsement modifies insurance provided under the following:

**MACHINERY AND EQUIPMENT COVERAGE FORM**

If branded or labeled merchandise that is Covered Property is damaged by an "accident" to an "object", we may take all or any part of the property at an agreed or appraised value.  If so you may, at your own expense:

**A.** Stamp salvage on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

**B.** Remove the brands or labels, if doing so will not physically damage the merchandise.  You must relabel the merchandise or its containers to comply with the law.

If you elect one of these options, we shall pay the difference between the salvage value of damaged merchandise with the brand or label attached and the salvage value of damaged merchandise with the brand or label removed.

BE 432 12 99

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# UNINTENTIONAL ERRORS IN DESCRIPTION

This endorsement modifies insurance provided under the following:

**MACHINERY AND EQUIPMENT COVERAGE FORM**

We will pay your loss covered by this policy if such loss is otherwise not payable solely because of any unintentional error in describing a location insured under this policy, the "objects" in that location, or other material information.

You agree to give us prompt notice of any such error when discovered.

BE 437 12 99

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OBJECT DEFINITION NO. 5 - COMPREHENSIVE COVERAGE

This endorsement modifies insurance under the following:

### MACHINERY AND EQUIPMENT COVERAGE FORM

**A.** "Object" means any:

1. Boiler, fired vessel, unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning vessels, and any metal piping and its accessory equipment;

2. Mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

3. Any of the following vessels listed below are included within the provisions of this section when used with an "object":

   a. Condensate return tank;

   b. Cushion or expansion tank used with a hot water heating boiler.

**B.** "Object" does not mean any:

1. Part of a boiler, fired vessel or electric steam generator that does not contain steam or water;

2. Insulating or refractory material;

3. Non-metallic vessel, unless it is constructed and used in accordance with the American Society of Mechanical Engineers Code (A.S.M.E.);

4. Catalyst;

5. "Buried" vessel or piping;

6. Sewer piping, piping forming a part of a fire protection system or water piping other than:

   a. Feed water piping between any boiler and its feed pump or injector; or

   b. Boiler condensate return piping; or

   c. Water piping forming a part of refrigerating and air conditioning vessels and piping used for cooling, humidifying or space heating purposes;

7. Part of an unfired vessel that is not under:

   a. Pressure of the contents of the vessel; or

   b. Internal vacuum;

8. Penstock, draft tube or well casing;

9. Structure, foundation, cabinet or compartment supporting or containing an "object";

10. Excavation or construction equipment, aircraft, floating vessel or structure, vehicle, or any equipment mounted thereon;

11. Felt, wire, screen, swing hammer, grinding disc, cable, chain, belt, rope or non-metallic part;

12. Die, mold, extrusion plate, cutting blade or any part or tool subject to periodic replacement for production or maintenance purposes;

13. "Object" manufactured by you for sale.

**C.** For any boiler or fired vessel, the furnace of the "object" and the gas passages from there to the atmosphere are not part of the "object".

**D.** When a vessel uses a heat transfer medium other than water or steam we will consider the medium or its vapor as substitutes for the words - water or steam.

**E.** We will consider that the connected ready for use requirement of the Coverage Form and its endorsements has been met by any "object" defined in this endorsement if that "object" is:

1. Periodically filled, moved, emptied and refilled in the course of its normal service; and

2. Used for storage of gas or liquid.

**F.** For any gas turbine, "accident" does not include the cracking of any part of the "object" exposed to the products of combustion.

**G.** Catalysts used with "objects" are not considered part of the "object".

**H.** The following definition is added for the purposes of this endorsement only:

"Buried" means any "object" or part of an "object" that is covered and in contact with soil or other fill material and not encased in conduit or a protective covering.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## JOINT OR DISPUTED LOSS AGREEMENT

This endorsement modifies insurance provided under the following:

**MACHINERY AND EQUIPMENT COVERAGE FORM**

**A.** This endorsement is intended to facilitate payment of insurance proceeds when:

1. Both a commercial property policy and this machinery and equipment policy are in effect;

2. Damage occurs to Covered Property that is insured by the commercial property policy and this machinery and equipment policy; and

3. There is disagreement between the insurers as to whether there is coverage or as to the amount of the loss to be paid, if any, by each insurer under its own policies.

**B.** This endorsement does not apply if:

1. Both the commercial property insurer(s) and we do not admit to any liability; and

2. Neither the commercial property insurer(s) nor we contend that coverage applies under the other insurer's policy.

**C.** The provisions of this endorsement apply only if all of the following requirements are met:

1. The commercial property policy carried by the named insured, insuring the Covered Property, contains a similar provision at the time of the loss or damage, with substantially the same requirements, procedures and conditions as contained in this endorsement;

2. The damage to the Covered Property was caused by a loss for which:

   a. Both the commercial property insurer(s) and we admit to some liability for payment under the respective policies; or

   b. Either:

      (1) The commercial property insurer(s) does not admit to any liability for payment, while we contend that:

         (a) All liability exists under the commercial property policy; or

         (b) Some liability exists under both the commercial property policy and this machinery and equipment policy;

      (2) We do not admit to any liability for payment, while the commercial property insurer(s) contends that:

         (a) All liability exists under this machinery and equipment policy; or

         (b) Some liability exists under both the commercial property policy and this machinery and equipment policy; or

      (3) Both the commercial property insurer(s) and we:

         (a) Do not admit to any liability for payment; and

         (b) Contend that some or all liability exists under the other insurer's policy; and

3. The total amount of the loss is agreed to by you, the commercial property insurer(s) and us.

**D.** If the requirements listed in **Paragraph C.** above are satisfied, we and the commercial property insurer(s) will make payments to the extent, and in the manner, described as follows:

1. We will pay, after your written request, the entire amount of loss that we have agreed as being covered, if any, by this machinery and equipment policy and one-half (1/2) the amount of the loss that is in disagreement.

2. The commercial property insurer(s) will pay, after your written request, the entire amount of loss that they have agreed as being covered, if any, by the commercial property policy and one-half (1/2) the amount of loss that is in disagreement.

3. Payments by the insurers of the amounts that are in disagreement, as described in **Paragraphs 1.** and **2.**, do not alter, waive or surrender any rights of any insurer

Includes copyrighted material of Insurance Services Office, Inc., with permission.

against any other with regard to the portion of the loss for which each insurer is liable.

4. The amount in disagreement to be paid by us under this endorsement shall not exceed the amount payable under the equivalent Loss Agreement(s) of the commercial property policy.

5. The amount to be paid under this endorsement shall not exceed the amount we would have paid had no commercial property policy been in effect at the time of loss. In no event will we pay more than the applicable Limit of Insurance shown in the Declarations.

6. Acceptance by you of sums paid under this endorsement does not alter, waive or surrender any other rights against us.

E. Arbitration

1. If the circumstances described in Paragraph C.2.a. exist and the commercial property insurer(s) and we agree to submit our differences to arbitration, the commercial property insurer(s) and we will determine the amount each will pay and will pay the insured within 90 days. Arbitration will then take place within 90 days after payment of the loss under the terms of this endorsement.

2. If any of the circumstances described in Paragraph C.2.b. exist, then the commercial property insurer(s) and we agree to submit our differences to arbitration within 90 days after payment of the loss under the terms of this endorsement.

3. You agree to cooperate with any arbitration procedures. There will be three arbitrators: one will be appointed by us, and another will be appointed by the commercial property insurer(s). The two arbitrators will select a third arbitrator. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. A decision agreed to by two of the three arbitrators will be binding on both parties. Judgment on any award can be entered in any court that has jurisdiction.

F. Final Settlement Between Insurers

The insurer(s) found responsible for the greater percentage of the ultimate loss must return the excess contribution to the other insurer(s). In addition, the insurer(s) found responsible for the greater portion of the loss must pay Liquidated Damages to the other insurer(s) on the amount of the excess contribution of the other insurer(s). Liquidated Damages are defined as interest from the date the insured invokes this Agreement to the date the insurer(s) that contributed the excess amount is reimbursed. The interest is calculated at 1.5 times the highest prime rate from the Money Rates column of the Wall Street Journal during the period of the Liquidated Damages. Arbitration expenses are not a part of the excess contribution for which Liquidated Damages are calculated. Arbitration expenses will be apportioned between insurers on the same basis that the ultimate loss is apportioned.

Includes copyrighted material of Insurance Services Office, Inc., with permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IOWA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CHEMICAL DRIFT LIMITED LIABILITY COVERAGE PART
CINCINNATI CYBER DEFENSE™ COVERAGE PART
CINCINNATI DATA DEFENDER™ COVERAGE PART
CINCINNATI NETWORK DEFENDER™ COVERAGE PART
CLAIMS-MADE EXCESS LIABILITY COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
CONTRACTOR'S ERRORS AND OMISSIONS COVERAGE PART - CLAIMS-MADE
CONTRACTORS' LIMITED POLLUTION LIABILITY COVERAGE FORM
CRIME AND FIDELITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY COVERAGE PART
EXCESS WORKERS COMPENSATION AND EMPLOYERS LIABILITY COVERAGE PART
FARM COVERAGE PART
GOLF COURSE CHEMICAL APPLICATION LIMITED LIABILITY COVERAGE PART
HOLE-IN-ONE COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MACHINERY AND EQUIPMENT COVERAGE PART
MANUFACTURER'S ERRORS AND OMISSIONS COVERAGE PART - CLAIMS-MADE
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE
SEPTIC SYSTEMS DESIGN AND INSPECTION ERRORS AND OMISSIONS COVERAGE PART
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. **a.** We may cancel this policy, by mailing or delivering to the first Named Insured and any loss payee written notice of cancellation at least:

   **(1)** 30 days before the effective date of cancellation if we cancel due to loss of reinsurance coverage; or

   **(2)** 10 days before the effective date of cancellation if we cancel for any other reason.

**b.** If this policy is a new policy and has been in effect for less than 60 days, we may cancel for:

   **(1)** Loss of reinsurance, subject to **d.** below; or

   **(2)** Any other reason.

**c.** If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel only for one or more of the following reasons:

   **(1)** Nonpayment of premium;

   **(2)** Misrepresentation or fraud made by or with your knowledge in obtaining the policy, when renewing the policy, or in presenting a claim under the policy;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

(3) Acts or omissions by you that substantially change or increase the risk insured;

(4) Determination by the commissioner that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of this or any other state;

(5) You have acted in a manner which you knew or should have known was in violation or breach of a policy term or condition; or

(6) Loss of reinsurance, subject to **d.** below.

**d.** We may cancel due to loss of reinsurance which provides coverage to us for a significant portion of the underlying risk insured, but only if the commissioner determines that such cancellation is justified.

**3.** We will mail or deliver our notice to the first Named Insured's and any loss payee's last mailing address known to us.

**4.** Notice of cancellation will state:

**a.** The reason for cancellation; and

**b.** The effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If either we cancel or the first Named Insured cancels, the refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, a post office department certificate of mailing is proof of receipt of notice. However, if cancellation is for nonpayment of premium, a certificate of mailing is not required.

**B.** The following is added and supersedes any other provision to the contrary.

**NONRENEWAL**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and any loss payee at least 45 days before:

**a.** The expiration date of this policy; or

**b.** The anniversary date of this policy, if the policy is written for a term of more than one year;

except if:

(1) We have offered to issue a renewal policy; or

(2) You have failed to pay a premium due or any advance premium required by us for renewal.

If notice is mailed, a post office department certificate of mailing is proof of receipt of notice.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# POLICYHOLDER NOTICE

# TERRORISM INSURANCE COVERAGE

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

Your policy contains coverage for certain losses caused by terrorism.

**Premium:**

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

- Refer to the SUMMARY OF PREMIUMS CHARGED or DECLARATIONS PAGE for the portion of your premium that is attributable to coverage for terrorist acts certified under the Act.

**Federal Participation:**

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals a percentage, as specified in the Schedule below, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

- **Schedule:**

| Federal Share of Terrorism Losses | | Federal Share of Terrorism Losses | |
|---|---|---|---|
| Percentage | Calendar Year | Percentage | Calendar Year |
| 85% | 2015 | 80% | 2022 |
| 84% | 2016 | 80% | 2023 |
| 83% | 2017 | 80% | 2024 |
| 82% | 2018 | 80% | 2025 |
| 81% | 2019 | 80% | 2026 |
| 80% | 2020 | 80% | 2027 |
| 80% | 2021 | | |

**Cap on Insurer Participation:**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**NOTE:** IF YOUR POLICY IS A RENEWAL POLICY, THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER TO RENEW THE POLICY **AND** (2) AT THE TIME THE RENEWAL IS COMPLETED.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**All Commercial Lines Coverage Parts, Coverage Forms, Policies and Endorsements subject to the federal Terrorism Risk Insurance Act and any amendments and extensions thereto**

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B. Cap On Losses from Certified Acts of Terrorism**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that ex-

ceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C. Application of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion, does not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part, Coverage Form, Policy or Endorsement such as losses excluded by:

1. Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;

2. Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or

3. Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the loss.

**D. Sunset Clause**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

Includes copyrighted material of ISO Properties, Inc. and American Association of Insurance Services, with their permission.

IA 4238 01 15

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.

Secretary                                                President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

IA 4338 05 11

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IOWA CHANGES - ACTUAL CASH VALUE

This endorsement modifies insurance provided under the following:

**BUILDERS RISK**
**BUSINESS AUTO COVERAGE FORM**
**COMMERCIAL INLAND MARINE CONDITIONS**
**COMMERCIAL OUTPUT POLICY - PROPERTY COVERAGE FORM**
**COMMERCIAL PROPERTY COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**
**FARM COVERAGE PART**
**GARAGE COVERAGE FORM**
**MACHINERY AND EQUIPMENT COVERAGE FORM**
**MORTGAGE INTEREST COVERAGE PART**
**NETWORK SYSTEMS MACHINERY AND EQUIPMENT COVERAGE FORM**
**STANDARD PROPERTY POLICY**

The following is added to any provision which uses the term actual cash value:

In our determination of the actual cash value of Covered Property at the time of loss or damage, we will take into account factors such as depreciation, deterioration and obsolescence.

IA 4387 IA 09 11

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections and Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer of Your Rights and Duties Under this Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98          Copyright, Insurance Services Office, Inc., 1998

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

IP 446 08 01

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ACTUAL CASH VALUE

This endorsement modifies insurance provided under the following:

**MACHINERY AND EQUIPMENT COVERAGE FORM**

### SCHEDULE*

Location(s) <u>905 W DEPOT AVE, FAIRFIELD, IA 52556-2563</u>

"Objects" <u>EQUIPMENT 25 YEARS OF AGE OR OLDER</u>

**E. MACHINERY AND EQUIPMENT CONDITIONS, 1. Loss Conditions, j. Valuation** is deleted in its entirety and replaced by the following for any "objects" entered at the locations indicated in the Schedule above:

**j.  Valuation**

We will pay you the "actual cash value" of your Covered Property directly damaged by the "accident". If damaged property can be restored by the replacement of any part or parts we will pay only the lesser of:

(1)  The reasonable cost of the restoration; or

(2)  The "actual cash value" of the damaged property.

* Information required to complete this schedule, if not shown on this endorsement, will be shown in the Declarations.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT



BE 485 11 12

E-FILED  2024 MAY 10 12:42 PM JEFFERSON - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR JEFFERSON COUNTY

| | |
|---|---|
| FAIRCAST, INC.,<br>     Plaintiff,<br><br>v.<br><br>THE CINCINNATI INSURANCE<br>COMPANY, THE CINCINNATI<br>CASUALTY COMPANY, THE<br>CINCINNATI INDEMNITY COMPANY,<br>WAYNE PINNEY, DON ESKER, and<br>DETROIT HOIST AND CRANE CO., L.L.C.<br>a.k.a. DETROIT HOIST AND CRANE CO.<br>     Defendants. | Case No.<br><br><br>**ORIGINAL NOTICE** |

TO THE ABOVE-NAMED DEFENDANTS:

You are notified that a petition has been filed in the office of the clerk of this court naming you as a Defendant in this action. A copy of the petition (and any documents filed with it) is attached to this notice. The name and address of Plaintiff's attorney are Joseph A. Cacciatore and Gregory G.T. Ervanian, 317 Sixth Avenue, Suite 900, Des Moines, Iowa 50309.

The attorney's phone number is 515-244-9400 and facsimile number is 515-282-4235.

You are further notified that the above case has been filed in a county that utilizes electronic filing.  Unless, within 20 days after service of this original notice upon you, you serve, and within a reasonable time thereafter file a motion or answer, in the Iowa District Court for Jefferson County, at the courthouse in Fairfield, Iowa, judgment by default will be rendered against you for the relief demanded in the petition.  Please see Iowa Court Rules Chapter 16 for information on electronic filing and Iowa Court Rules Chapter 16, division VI regarding the protection of personal information in court filings.

If you need assistance to participate in court due to a disability, call the disability coordinator at 641-684-6502.  Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942).  **Disability coordinators cannot provide legal advice.**

**Important:  You are advised to seek legal advice to protect your interests.**

# Iowa Judicial Branch

*Case No.*   **LALA004611**

*County*   **Jefferson**

*Case Title*   FAIRCAST, INC. V. THE CINCINNATI INSURANCE COMPANY

You must file your Appearance and Answer on the Iowa Judicial Branch eFile System, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless the court has excused you from filing electronically (*see* Iowa Court Rule 16.302).

Register for the eFile System at www.iowacourts.state.ia.us/Efile to file and view documents in your case and to receive notices from the court.

For general rules and information on electronic filing, refer to the Iowa Rules of Electronic Procedure in chapter 16 of the Iowa Court Rules at www.legis.iowa.gov/docs/ACO/CourtRulesChapter/16.pdf.

Court filings are public documents and may contain personal information that should always be kept confidential.  For the rules on protecting personal information, refer to Division VI of chapter 16 of the Iowa Court Rules and to the Iowa Judicial Branch website at www.iowacourts.gov/for-the-public/representing-yourself/protect-personal-information/.

*Scheduled Hearing:*

If you need assistance to participate in court due to a disability, call the disability access coordinator at **(641) 684-6502** . Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). For more information, see www.iowacourts.gov/for-the-public/ada/.  **Disability access coordinators cannot provide legal advice.**

*Date Issued*  **05/10/2024 01:15:33 PM**



*District Clerk of Court or/by Clerk's Designee of* Jefferson          *County*

**/s/ Alli Deao**

E-FILED  2024 MAY 16 2:44 PM JEFFERSON - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR JEFFERSON COUNTY

Case Number: LALA004611

| | |
|---|---|
| FAIRCAST,  INC.,<br>Plaintiff(s),<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY,<br>THE CINCINNATI CASUALTY COMPANY,<br>THE CINCINNATI INDEMNITY COMPANY,<br>WAYNE PINNEY, DON ESKER, and<br>DETROIT HOIST AND CRANE CO., L.L.C.<br>a.k.a. DETROIT HOIST AND CRANE CO.,<br>Defendant(s), | ACCEPTANCE OF SERVICE |

Service of the foregoing, ORRIGINAL NOTICE, PETITION ET AL, is hereby accepted as provided by the law for  THE CINCINNATI INDEMNITY COMPANY, defendant named herein, the 16th of MAY, 2024.

Commissioner of Insurance

Doug Ommen

IN THE IOWA DISTRICT COURT FOR JEFFERSON COUNTY

Case Number: LALA004611

| | |
|---|---|
| FAIRCAST,  INC., ) | ACCEPTANCE OF SERVICE |
| Plaintiff(s), ) | |
| ) | |
| v. ) | |
| ) | |
| THE CINCINNATI INSURANCE COMPANY, ) | |
| THE CINCINNATI CASUALTY COMPANY, ) | |
| THE CINCINNATI INDEMNITY COMPANY, ) | |
| WAYNE PINNEY, DON ESKER, and ) | |
| DETROIT HOIST AND CRANE CO., L.L.C. ) | |
| a.k.a. DETROIT HOIST AND CRANE CO., ) | |
| Defendant(s), ) | |

Service of the foregoing, ORRIGINAL NOTICE, PETITION ET AL, is hereby accepted as provided by the law for THE CINCINNATI CASUALTY COMPANY, defendant named herein, the 16th of MAY, 2024.

Commissioner of Insurance

Doug Ommen

IN THE IOWA DISTRICT COURT FOR JEFFERSON COUNTY

Case Number: LALA004611

| | |
|---|---|
| FAIRCAST,  INC.,<br>Plaintiff(s),<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY,<br>THE CINCINNATI CASUALTY COMPANY,<br>THE CINCINNATI INDEMNITY COMPANY,<br>WAYNE PINNEY, DON ESKER, and<br>DETROIT HOIST AND CRANE CO., L.L.C.<br>a.k.a. DETROIT HOIST AND CRANE CO.,<br>Defendant(s), | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  ACCEPTANCE OF SERVICE |

---

Service of the foregoing, ORRIGINAL NOTICE, PETITION ET AL, is hereby accepted as provided by the law for THE CINCINNATI INSURANCE COMPANY, defendant named herein, the 16th of MAY, 2024.

Commissioner of Insurance

Doug Ommen

E-FILED  2024 MAY 20 4:53 PM JEFFERSON - CLERK OF DISTRICT COURT

## AFFIDAVIT OF SERVICE

| Case:<br>LALA004611 | Court:<br>IOWA DISTRICT COURT | County:<br>JEFFERSON, IA | Job:<br>11083506 |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>FAIRCAST, INC | | **Defendant / Respondent:**<br>THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, THE CINCINNATI INDEMNITY COMPANY, WAYNE PINNEY, DON ESKER, AND DETROIT HOIST AND CRANE CO.,L.L.C. AKA DETROIT HOIST AND CRANE CO. | |
| **Received by:**<br>Attorneys Process Service | | **For:**<br>ERVANIAN AND CACCIATORE, LLP | |
| **To be served upon:**<br>DON ESKER | | | |

I, Michael Barry, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   DON ESKER, 1310 Fox Trail Drive Northeast, Cedar Rapids, IA 52402

**Manner of Service:**   **Personal/Individual**, May 19, 2024, 11:00 am CDT

**Documents:**   ORIGINAL NOTICE, PETITION AND JURY DEMAND

**Additional Comments:**

1) **Successful service**: May 19, 2024, 11:00 am CDT at 1310 Fox Trail Drive Northeast, Cedar Rapids, IA 52402 received by DON ESKER. Age: 40-50'S; Ethnicity: Caucasian; Gender: Male; Weight: 180; Height: 5'9"; Hair: Brown;

2) Unsuccessful Attempt: May 13, 2024, 1:00 pm CDT at 1310 Fox Trail Drive Northeast, Cedar Rapids, IA 52402
NO ANSWER AT THE DOOR

3) Unsuccessful Attempt: May 15, 2024, 9:00 am CDT at 1310 Fox Trail Drive Northeast, Cedar Rapids, IA 52402
NO ANSWER AT THE DOOR

4) Unsuccessful Attempt: May 17, 2024, 6:14 pm CDT at 1310 Fox Trail Drive Northeast, Cedar Rapids, IA 52402
NO ANSWER AT THE DOOR

**Fees:**   $50.00 service fee  $10 mileage  Total $60.00

|  |  |
|---|---|
| _signature_<br>Michael Barry | 5/20/24<br>Date |

Attorneys Process Service
1233 1st Avenue SE Ste F
Cedar Rapids, IA 52402
319-431-7000

_Subscribed and sworn to before me by the affiant who is personally known to me._

_Lisa A. Cooper_
Notary Public

5-20-24
| Date | Commission Expires |



| **PROOF OF SERVICE** | **SUMMONS** |
|---|---|
| | Case No. _LALA00461l_ |

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☑ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:    (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), that:    (notarization required) |

☑ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____

List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| DETROIT HOIST & CRANE CO. LLC c/o Michael Vorpahl | 6650 STERLING DR. North, STERLING HTS, MI 48312 | MON 5/13/2024 12:20 PM |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | **TOTAL FEE** $ |

Signature _Easter Barber_

Name (type or print) _EASTER BARBER_

Title _PROCESS SERVER_

Subscribed and sworn to before me on _5-17-2024_, Oakland Acting in Oakland County, Michigan.
                                                              Date

My commission expires: _7-16-2027_    Signature: _____
                          Date                                Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

DAVID KREUCHER
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Jul 16, 2027
ACTING IN COUNTY OF OAKLAND

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____ Attachments

_____ on _____
                                      Day, date, time

_____ on behalf of _____

Signature _____

Open.P1042.P1042.30182053-1

E-FILED 2024 MAY 27 8:52 AM JEFFERSON - CLERK OF DISTRICT COURT

_Iowa Dist. ct. Jefferson County_
**(NAME OF COURT)**                                   CASE # _LALA004611_

PLAINTIFF/ _Faircast Inc._

_____   VS.

DEFENDANT/ _The Cincinnati Insurance Co. Et Al_

_____

I _REV TONY HODGE_ , being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.

Service: I served _Def. Wayne Pinney_
**NAME OF PERSON/ENTITY BEING SERVED**

With (list documents) _Petition at Law and Jury Demand, original Notice_

_____

By leaving with _Marcia Glynn_          _Asst Legal Dept_
**NAME**                                  **RELATIONSHIP**

[ ] Residence _0_
**ADDRESS**                              **CITY/STATE**

[X] Business _6200 S. Gilmore Rd._    _Fairfield, Oh. 45013_
**ADDRESS**                              **CITY/STATE**

On _5-16-24_ At _3:30pm_
**DATE**              **TIME**

Thereafter copies of the documents were mailed by prepaid, first class mail on _____
**DATE**

From _____   Active Military [ ] ____ [ ] ____
**CITY**      **STATE**      **ZIP**                      YES          NO
                                          Marital Status [ ] ____ [ ] ____

Manner of Service:
[ ] Personal: By personally delivering copies to the person being served.
[ ] Substituted at Residence: By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of ____ and explaining the general nature of the papers.
[X] Substituted at Business: By leaving, during office hours, copies at the office of the person/entity be served with the person apparently I charge thereof.
[ ] Posting: By posting copies in a conspicuous manner to the up front door of the person/entity be served.
[ ] Non-Service: After due search, carefully inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity served because of the following reason (s):
[ ] Unknown at address     [ ] Moved, Left no Forwarding     [ ] Service Cancelled by Litigant     [ ]Unable the Serve in timely fashion     [ ] Address does not exist     [ ] Other

Service Attempts: Service:  (1) _5-1-24_ _10:10 AM_ (2) _____ (3) _____
                      **DATE**  **TIME**    **DATE**  **TIME**   **DATE**  **TIME**
(4) _____ (5) _____ (6) _____
   **DATE** **TIME**   **DATE** **TIME**   **DATE** **TIME**

_Rev. Tony Hodge_
**Signature of Process Server**

SUBSCRIBED AND SWORN to before me this _17_ day of _May_ , 20___

_____
Notary Public



www.godbrother.com
www.processserviceohio.com
earthtemple.org
Cleveland: (216) 906-9444
Columbus: (614) 231-5595
Fax: (614) 258-8903
Wash. D.C. Toll Free: (877) LAW-TONY
godbrothercom@sbcglobal.net

C.O.P.S, Div. of Dr. A. T. Hodge Legal Services/Ltd.
1695 Franklin Ave.        (All Ohio 24/7)
Columbus OH 43205